This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 119
In the Matter of World Trade
Center Lower Manhattan Disaster
Site Litigation.
----------------------------------
Stanislaw Faltynowicz, et al.,
       Appellants,
State of New York,
       Intervenor-Appellant,
       v.
Battery Park City Authority, et
al.,
       Respondents.
----------------------------------
Santiago Alvear,
       Appellant,
State of New York,
       Intervenor-Appellant,
       v.
Battery Park City Authority,
       Respondent.
----------------------------------
Peter Curley et al.,
       Appellants,
State of New York,
       Intervenor-Appellant,
       v.
Battery Park City Authority,
       Respondent.

      Andrew W. Amend, for intervenor-appellant.
      Luke W. Nikas, for appellants Alvear, et al.
      Daniel S. Connolly, for respondents.

FEINMAN, J.:

      This matter comes to us from an order of the United States Court of Appeals for the Second Circuit certifying the following questions pursuant to Rule 500.27 of this Court:

- 1 -

> "(1) Before New York State's capacity-to-sue doctrine may be applied to determine whether a State-created public benefit corporation has the capacity to challenge a State statute, must it first be determined whether the public benefit corporation 'should be treated like the State,' [(Clark-Fitzpatrick, Inc. v Long Island R.R. Co., 70 NY2d 382 [1987])], based on a 'particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it,' [(John Grace & Co. v State Univ. Constr. Fund, 44 NY2d 84 [1978])], and if so, what considerations are relevant to that inquiry?; and

> "(2) Does the 'serious injustice' standard articulated in [Gallewski v H. Hentz & Co. (301 NY 164 [1950])], or the less stringent 'reasonableness' standard articulated in [Robinson v Robins Dry Dock & Repair Co. (238 NY 271 [1924])], govern the merits of a due process challenge under the New York State Constitution to a claim-revival statute?"

(In re World Trade Center Lower Manhattan Disaster Site Litig., 846 F3d 58, 70 [2d Cir 2017]). We accepted the certified questions on February 9, 2017 (see 28 NY3d 1159 [2017]).

I.

Plaintiffs in the consolidated appeal before the Second Circuit are workers who participated in cleanup operations in New York City following the September 11, 2001 terrorist attacks. The defendant is Battery Park City Authority (BPCA). BPCA was established by the State legislature as a public benefit corporation to redevelop blighted areas in lower Manhattan and to expand the supply of safe and sanitary housing for low-income families (see Public Authorities §§ 1971, 1973[1]). Plaintiffs initially brought claims between 2006 and 2009 alleging that they

developed a host of illnesses as a result of their exposure to harmful toxins at BPCA-owned properties in the course of their cleanup duties.[1] However, in July 2009, the District Court dismissed plaintiffs' claims, together with hundreds of other similar claims against BPCA, on the grounds that the plaintiffs did not serve BPCA with timely notices of claim (see General Municipal Law § 50-e; Public Authorities Law § 1984).

The legislature responded to these dismissals by enacting Jimmy Nolan's Law, which became effective September 16, 2009 (see L 2009, ch 440). The law amended the General Municipal Law to provide, in relevant part:

> "Notwithstanding any other provision of law to the contrary, including . . . section fifty-e of this article . . . any cause of action against a public corporation for personal injuries suffered by a participant in World Trade Center rescue, recovery or cleanup operations as a result of such participation which is barred as of the effective date of this subdivision because the applicable period of limitation has expired is hereby revived, and a claim thereon may be filed and served and prosecuted provided such claim is filed and served within one year of the effective date of this subdivision"

(General Municipal Law § 50-i[4][a], as added by L 2009, ch 440 § 2). The effect of the law was to revive the plaintiffs' time-

---

[1] Though asserted in federal District Court, New York law furnished the substantive law governing these claims (see Air Transportation Safety and System Stabilization Act (ATSSSA), Pub. L. No. 107-42, § 408[b][2] [Sept. 22, 2001]); In re World Trade Center Lower Manhattan Disaster Site Litig., 846 F3d at 62 n 2).

barred causes of action for one year after its enactment.

Many of the 9/11 cleanup workers whose claims had previously been dismissed, including plaintiffs, served new notices of claim on BPCA within the one-year revival period prescribed by Jimmy Nolan's Law. BPCA moved for summary judgment on the grounds that Jimmy Nolan's Law was unconstitutional under the Due Process Clause of the State Constitution (see NY Const art I, § 6). Upon due notice, the Attorney General intervened to defend the constitutionality of the law.

The District Court granted summary judgment in favor of BPCA and held that Jimmy Nolan's Law was unconstitutional as applied (see In re World Trade Center Lower Manhattan Disaster Site Litig., 66 F Supp 3d 466 [SD NY 2014]). As a threshold matter, the court recognized our "traditional rule that 'municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation'" (id. at 471, quoting City of New York v State of New York, 86 NY2d 286, 289 [1995]). Nevertheless, the court cited a line of cases stating that "a 'particularized inquiry is necessary to determine whether -- for the specific purpose at issue -- the public benefit corporation should be treated like the State'" (id., quoting Clark-Fitzpatrick, Inc. v Long Island R.R. Co., 70 NY2d 382 [1987]) and concluded that "BPCA is an entity independent of the State and has capacity to challenge the constitutionality of

the Legislature's acts" (id. at 473). On the merits, the court found the law unconstitutional on the grounds that it was not passed in response to "exceptional" circumstances or a "serious injustice" (id. at 476, citing Gallewski v H. Hentz & Co., 301 NY 164 [1950]).

Plaintiffs appealed to the Second Circuit. After discerning an "absence of authoritative guidance" on both the capacity issue and the proper standard of review in evaluating the constitutionality of claim-revival statutes (846 F3d at 69), the Second Circuit certified the questions set out above.

II.

The first question essentially asks us to decide whether our general rule -- that State entities lack capacity to challenge the constitutionality of a State statute -- is any less applicable to public benefit corporations than it is to other types of governmental entities, such as municipalities. We hold that it is not, and that no "particularized inquiry" is necessary to determine whether public benefit corporations should be treated like the State for purposes of capacity.

A.

Capacity "concerns a litigant's power to appear and bring its grievance before the court" (Community Bd. 7 of Manhattan v Schaffer, 84 NY2d 148, 155 [1994]). Entities created by legislative enactment, such as the BPCA, "have neither an inherent nor a common-law right to sue" (id. at 155-56). "Rather,

their right to sue, if it exists at all, must be derived from the relevant enabling legislation or some other concrete statutory predicate" (id. at 156). Capacity should not be confused with standing, which relates to whether a party has suffered an "injury in fact" conferring a "concrete interest in prosecuting the action" (Society of Plastics Indus., Inc. v County of Suffolk, 77 NY2d 761, 772-73 [1991]), and which "go[es] to the jurisdiction of the court" (City of New York, 86 NY2d at 292). Capacity, unlike standing, does not concern the injury a party suffered, but whether the legislature invested that party with authority to seek relief in court. As such, capacity is a question of legislative intent and substantive State law.

Generally, "municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation" (id. at 289). During the more than 80 years predating our City of New York decision, our courts characterized this prohibition somewhat inconsistently, referring to it, at various times (and sometimes simultaneously), as a lack of capacity (see Albany County v Hooker, 204 NY 1 [1912]), a lack of standing (see Village of Herkimer v Axelrod, 58 NY2d 1069 [1983]; Black River Regulating Dist. v Adirondack League Club, 307 NY 475, 489 [1954]; Matter of Town of Moreau, 142 AD2d 864 [3d Dept 1988]; City of Buffalo v State Bd. of Equalization & Assessment, 26 AD2d 213 [3d Dept 1966]) or a substantive determination that

the State acts complained of were not unconstitutional at all (see Matter of County of Cayuga v McHugh, 4 NY2d 609, 616 [1958]; Black River, 307 NY at 489-90; Brown v State Comm'n of Correction, 104 AD2d 238 [3d Dept 1984]; City of Utica v Oneida County, 187 Misc 960, 965-66 [Sup Ct, Oneida Cty, 1946], appeal dismissed 70 NYS2d 582 [4th Dept 1947]). However, in City of New York (86 NY2d 286), we definitively stated the rule in terms of capacity, as opposed to standing or substantive constitutional law. It has remained a capacity rule ever since (see County of Chemung v Shah, 28 NY3d 244, 262 [2016]; County of Nassau v State, 100 AD3d 1052 [3d Dept 2012], lv denied 20 NY2d 1092 [2013]; New York Blue Line Council, Inc. v Adirondack Park Agency, 86 AD3d 756, 758-59 [3d Dept 2011]; lv denied sub nom. Clinton County Towns of Broadalbin v Adirondack Park Agency, 18 NY3d 806 [2013]; Gulotta v State, 228 AD2d 555 [2d Dept 1996], appeal dismissed 88 NY2d 1053 [1996], lv denied 89 NY2d 811 [1997]).[2]

In City of New York, we rejected claims by the City of New York, Board of Education of the City, Mayor and Chancellor of the City School District that the State's statutory scheme for funding public education denied school children their constitutional rights under the Education Article of the State

---

[2] In line with these precedents, all parties agree that the relevant bar to BPCA's challenge to Jimmy Nolan's Law, if it exists at all, is a capacity bar. None of the parties have asked us to reconfigure the rule as one of standing.

Constitution, the Equal Protection Clauses of the federal and State Constitutions and Title VI of the Civil Rights Act of 1964 (see City of New York, 86 NY2d at 289). We observed that "municipal corporate bodies . . . are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as agents" and held that the municipal plaintiffs therefore lacked capacity to bring their claims (id. at 289-90).

Our capacity rule reflects a self-evident proposition about legislative intent: the "manifest improbability" (id. at 293) that the legislature would breathe constitutional rights into a public entity and then equip it with authority to police State legislation on the basis of those rights. It also reflects sound principles of judicial restraint, "the extreme reluctance of courts to intrude in the political relationships between the Legislature, the State and its governmental subdivisions" (id. at 296). "[T]he Legislature, within constitutional limitations, may by legislative fiat diminish, modify or recall any power delegated" to its political subdivisions (Matter of County of Cayuga v McHugh, 4 NY2d 609, 614-15 [1958]). "[T]he entire subject being one of governmental and public policy, . . . the wrong, if any, created and existing by the acts of the legislature, must be corrected by the legislature, or by an action where the people, as distinguished from a municipal corporate body, are before the court" (City of New York, 86 NY2d

at 294, quoting Hooker, 204 NY at 18-19). Hence, with few exceptions, this capacity bar closes the courthouse doors to internal political disputes between the State and its subdivisions.

The capacity rule is not absolute. A political subdivision with "express statutory authorization" to bring a constitutional challenge would not be found wanting in capacity (id. at 291; accord Hooker, 204 NY at 9), though a generic grant of authority to "sue or be sued" will be insufficient (City of New York, 86 NY2d at 293).[3] Even in the absence of explicit authority, the assertion of some constitutional rights may, by their nature, present special circumstances to which the general rule must yield (see id. at 291-92). To date, we have identified a limited number of situations presenting such special circumstances, such as where a public entity is "vested with an entitlement to a specific fund by a statute" and the challenged statute adversely affects its interest in the fund (Town of Moreau v Saratoga County, 142 AD2d 864 [3d Dept 1988]; accord City of New York, 86 NY2d at 291-92; County of Rensselaer v

---

[3] We disagree with the assertion in Judge Wilson's concurrence that capacity is a "binary," all-or-nothing proposition (Wilson, J. concurring op at 1). To the contrary, we have recognized that "[c]apacity is examined with a view towards the relief sought" (Excess Line Ass'n of New York v Waldorf & Associates, -- NY3d --, 2017 Slip Op 07301 [Oct. 19, 2017]), which means that the same party may have capacity to bring one kind of claim but not another (see Graziano v County of Albany, 3 NY3d 475, 479-81 [2004]; Silver v Pataki, 96 NY2d 532, 537-38 [2001]).

Regan, 173 AD2d 37 [3d Dept 1991], affd 80 NY2d 988 [1992]),

where a State statute impinges on a municipality's home rule

powers under the State Constitution (see Town of Black Brook v

State, 41 NY2d 486 [1977]), or where a public entity asserts that

if it is obliged to comply with a statute it "will by that very

compliance be forced to violate a constitutional proscription"

(City of New York, 86 NY2d at 292, quoting Jeter v Ellenville

Central School Dist., 41 NY2d 283, 287 [1977]).[4]

We stress that the exceptions we have recognized to

date are narrow. Under the general rule, we have barred public

entities from challenging a wide variety of State actions, such

as, e.g., the allocation of State funds amongst various

---

[4] Our capacity rule is ultimately derived from a line of
analogous federal cases sometimes referred to as the "Hunter
cases" (see Hunter v City of Pittsburgh, 207 US 161 [1907];
see also Williams v Mayor and City Council of Baltimore, 289 US
36 [1933]; Trenton v New Jersey, 262 US 182 [1923]). Other state
and federal courts, including the Supreme Court of the United
States, have identified some possible additional exceptions to
the Hunter cases (see e.g. Gomillion v Lightfoot, 364 US 339,
342-345 [1960] [Equal Protection challenges to race-based
redistricting]; Branson School Dist. RE-82 v Romer, 161 F3d 619,
628-629 [10th Cir 1998] [Supremacy Clause challenge], cert denied
526 US 1068 [1999]; Rogers v Brockette, 588 F2d 1057, 1067-1071
[5th Cir 1979] [Supremacy Clause challenge]; Star-Kist Foods,
Inc. v County of Los Angeles, 719 P2d 987 [Cal. 1986] [in bank]
[Dormant Commerce Clause challenge], cert denied 480 US 930
[1987]; but see Indian Oasis-Baboquivari Unified School Dist. No.
40 of Pima County, Ariz. v Kirk, 91 F3d 1240, 1242-1243 [9th Cir
1996] [rejecting Supremacy Clause challenge], appeal dismissed en
banc 109 F3d 634 [9th Cir 1997]). We have not yet considered
whether analogous exceptions exist for purposes of New York's
capacity rule. In any event, they are not relevant here.

localities (see City of New York, 86 NY2d 286; Hooker, 204 NY 1), the modification of a village-operated hospital's operating certificate (see Village of Herkimer, 58 NY2d 1069), the closure of a local jail by the State (see Matter of County of Cayuga, 4 NY2d at 616), special exemptions from local real estate tax assessments (see City of Buffalo, 26 AD2d 213), laws mandating that counties make certain expenditures (see Gulotta, 228 AD2d 555), State land use regulations (see New York Blue Line Council, 86 AD3d at 758-59) and State laws requiring electronic voting systems to be installed at polling places in lieu of lever-operated machines (see County of Nassau, 100 AD3d 1052).

## B.

BPCA contends that public benefit corporations like itself are not fully governmental in nature. Therefore, BPCA argues, a court must conduct a "particularized inquiry" (John Grace & Co. v State Univ. Constr. Fund, 44 NY2d 84, 88 [1978]) to determine whether a particular public benefit corporation should be treated like the State before the capacity rule can be applied. For the reasons that follow, we disagree.

There are three types of public corporations: municipal corporations, district corporations and public benefit corporations (see General Construction Law § 65[b]). A public benefit corporation is "a corporation organized to construct or operate a public improvement wholly or partly within the state, the profits from which inure to the benefit of this or other

states, or to the people thereof" (id. § 66[4]). Devised in the early 20th century as "a new vehicle for funding public works projects" that "insulate[d] the State from the burden of long-term debt" (Schulz v State of New York, 84 NY2d 231, 244 [1994]), public benefit corporations are able to issue debt for which the State itself is not liable (see NY Const, art X, § 5). In addition, "[a]lthough created by the State and subject to dissolution by the State, these public corporations are independent and autonomous, deliberately designed to be able to function with a freedom and flexibility not permitted to an ordinary State board, department or commission" (Matter of Plumbing, Heating, Piping & A.C. Contrs. Assn. v New York State Thruway Auth., 5 NY2d 420, 423 [1959]). We have therefore understood the primary utility of public benefit corporations as twofold: to "protect the State from liability" and to "enable public projects to be carried on free from restrictions otherwise applicable" (id. at 423). In this context, we have sometimes described public benefit corporations as "enjoying an existence separate and apart from the State, its agencies and political subdivisions" (Schulz, 84 NY2d at 246 n 4 [collecting cases]).

These properties, however, do not bring public benefit corporations outside of the scope of our capacity rule. It is true that much of our analysis in City of New York rested on the "historical fact" that municipalities are "mere[] subdivisions" having no "right to contest the actions of their principal or

creator" (City of New York, 86 NY2d at 289-91). However, our capacity rule is not a stilted axiom governing the position of the parts to the whole, or the relationship between the State as principal and its subdivisions as agents. Rather, as discussed above, it is nothing more than a commonsense presumption of legislative intent, informed by practical concerns about judicial overreach. The features that arguably render public benefit corporations something more than mere subdivisions, namely, the separation of "their administrative and fiscal functions from the State" (Collins v Manhattan & Bronx Surface Tr. Operating Auth., 62 NY2d 361, 367 [1984]), do not diminish the considerations we have already mentioned that support this rule.

BPCA cites to a line of cases from this Court rejecting a per se rule that public benefit corporations are identified with the State. In those cases, we held that "[t]he mere fact that" a public benefit corporation "is an instrumentality of the State, and as such, engages in operations which are fundamentally governmental in nature does not inflexibly mandate a conclusion that it is the State or one of its agencies . . . Instead, a particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it is required" (John Grace & Co., Inc., 44 NY2d at 88). Under the particular circumstances presented in those cases, we held that a public benefit corporation would be treated like the State for purposes of immunity from punitive damages (see Clark-Fitzpatrick, Inc.,

70 NY2d 382), but not for purposes of contract bidding requirements under the State Finance Law (see Matter of Plumbing, Heating, Piping & A.C. Contrs. Assn., 5 NY2d 420), sovereign immunity (Matter of Dormitory Auth. of State of N.Y. (Span Elec. Co.), 18 NY2d 114 [1966]), statutes providing for equitable relief to certain public contractors (see John Grace & Co. Inc., 44 NY2d 84) or a provision of the Penal Law punishing the submission of false instruments to the State (see People v Miller, 70 NY2d 903 [1987]).

However, applying this line of cases here would strip them of their context. The issue in each of these cases was whether a statute or common law rule defining the State's rights or responsibilities vis-á-vis private parties could be extended to a public benefit corporation. Given the primary function of a public benefit corporation "to resemble in many respects a private business corporation . . . as a means of expanding government operations into areas generally carried on by private enterprise" (Collins, 62 NY2d at 368, 371 [internal quotations omitted]), we understood that a public benefit corporation's outward-facing relations with private parties -- such as employees, customers and other business counterparts -- would not necessarily be subject to the same laws that might apply when one does business with the government. Hence, in most of these cases, our overriding aim was to give maximum effect to the legislature's intent; we closely analyzed the public benefit

corporation's enabling act, or the statute claimed to be applicable to it, in order to determine whether the corporation was intended to assume the guise of a private person in its legal relations with the general public (see Clark-Fitzpatrick, Inc., 70 NY2d at 386-88; John Grace & Co., Inc., 44 NY2d at 89; Matter of Dormitory Auth., 18 NY2d at 117-18; Matter of Plumbing, Heating, Piping & A.C. Contrs. Assn., 5 NY2d at 423-24). As for Miller, we were specifically concerned that the statute at issue, if made applicable to statements given to public benefit corporations, could impose criminal penalties without "fair warning" to the public (70 NY2d at 907, citing People v Nelson, 69 NY2d 302 [1987]). None of the foregoing considerations apply where, as here, a court is called upon to evaluate a public benefit corporation's inward-facing relations with other State bodies.[5]

C.

The parties dispute the significance of two particular cases for our decision today. Plaintiffs and the Attorney General

---

[5] BPCA argues that this case, too, involves a public benefit corporation's relationship with private third parties -- the plaintiffs -- and therefore falls within the "particularized inquiry" line of cases. This argument is unavailing. We are not distinguishing the "particularized inquiry" cases on the grounds that they only involved disputes between public benefit corporations and private parties -- clearly, not all of them did (see e.g. Miller, 70 NY2d 903). Rather, the distinction is that, in those cases, the right, privilege or duty of the State claimed to be applicable to the public benefit corporation was one that regulated the State's legal relations with private parties, as opposed to a rule, such as our capacity rule, that only governs intra-State relations.

contend that this case falls within our ruling in <u>Black River Regulating Dist. v Adirondack League Club</u> (307 NY 475), where we held that the plaintiff, a river regulating district, could not maintain an action seeking a declaration that an act of the legislature was unconstitutional. By contrast, BPCA argues that our holding in <u>Patterson v Carey</u> (41 NY2d 714 [1977]) implicitly recognized that public corporations, under some circumstances, had capacity to bring such actions.

We agree with the plaintiffs and the Attorney General that our holding in <u>Black River</u> precludes BPCA's proposed particularized inquiry approach. In that case, the Black River Regulating District (the District), a public corporation, sought a declaration that the Stokes Act (L 1950, ch 803), which prohibited "any river regulating board" from constructing certain reservoirs, was unconstitutional (<u>Black River</u>, 307 NY at 483-85). We rejected the District's attempted challenge. We observed that the District's "only purpose," to construct reservoirs, was "a State purpose" and the District therefore had "no special character different from that of the State" (<u>id.</u> at 489). We also noted that the powers of the District to carry out these State purposes "are within the State's absolute discretion" to alter, impair or destroy (<u>id.</u> at 487). "[P]olitical power conferred by the Legislature," we explained, "confers no vested right against the government itself. . . . [T]he power conferred by the Legislature is akin to that of a public trust [and may] be

exercised not for the benefit or at the will of the trustee but for the common good" (id. at 488).

The District also argued that it could sue in order to vindicate the rights of its bondholders, whose bonds, it claimed, would be impaired if the Stokes Act were not struck down (see Black River Regulating Dist. v. Adirondack League Club, 282 AD 161, 168-70 [4th Dept 1953], revd 307 NY 475). We rejected this contention; the mere fact that the District could issue certificates of indebtedness, we held, "does not confer upon [the District] an independent status by which they have standing . . . to test the validity of the Stokes Act" (Black River, 307 NY at 489).

The precise holding in Black River, as we phrased it at the time, was that the plaintiffs lacked "standing" (or "status") to seek a declaration that the Stokes Act was unconstitutional (id. at 489-90).[6] However, it is clear that there was no real issue of "standing" in that case; the defendant was a private landowner subject to a condemnation proceeding by the District, a proceeding that would have been unlawful unless the District obtained the declaration it sought that the Stokes Act was unconstitutional (see Black River Regulating Dist. v Adirondack League Club, 201 Misc 808, 811 [Sup Ct, Jefferson County 1952], revd 282 AD 161, revd 307 NY 475). Rather, in holding that the District did not have "status" to sue (Black River, 307 NY at

_____

[6] Separately, the Court held that the law was constitutional on the merits (see id.).

490), the Court was contemplating what we now recognize as

capacity rather than standing (see City of New York, 86 NY2d at

291, citing Black River, 307 NY 475).

We find unpersuasive BPCA's attempt to distinguish

Black River. BPCA argues that the District was only established

as a "public corporation," not a "public benefit corporation."

The Special Term in Black River described the District's enabling

statute as follows:

> "Section 431 provides that bodies corporate
> may be created 'to construct, maintain and
> operate reservoirs within such districts,
> subject to the provisions of this act, for
> the purpose of regulating the flow of
> streams, when required by the public welfare,
> including public health and safety. Such
> river regulating districts are declared to be
> public corporations and shall have perpetual
> existence and the power to acquire and hold
> such real estate and other property as may be
> necessary, to sue and be sued, to incur
> debts, liabilities and obligations, to
> exercise the right of eminent domain and of
> assessment and taxation, to issue bonds and
> other evidences of indebtedness and to do all
> acts and exercise all powers authorized by
> and subject to the provisions of this
> article. Such powers shall be exercised by
> and in the name of the board of the
> district'"

(Black River, 201 Misc at 813). Therefore, it is clear that the

District, in substance, if not in form, was a public benefit

corporation (see General Construction Law § 66[4]; see also N.

Elec. Power Co., L.P. v Hudson River-Black River Regulating

Dist., 122 AD3d 1185, 1186 [3d Dept 2014] [describing the Black

River Regulating District as a "public benefit corporation"]). We

note that the District would not qualify as either a municipal corporation or a district corporation (see General Construction Law § 66[2], [3]), the only other types of public corporations (see id. § 65[b]).

BPCA argues that, even if Black River involved a public benefit corporation, our analysis was consistent with BPCA's proposed "particularized inquiry" test. According to this argument, the Court conducted such a particularized inquiry when it specifically identified the District's purposes "to construct reservoirs" as "a State purpose" (307 NY at 489). Although the District lacked power to sue in that particular case, BPCA argues that this does not necessarily foreclose challenges by other public benefit corporations with different purposes and under different circumstances. We do not read Black River so narrowly. There was nothing special about reservoir construction that compelled us to rule as we did; rather, it was enough that the District's raison d'être was to carry out its activities "for the common good" (id. at 488). BPCA's attempt to harmonize its approach with Black River fails because our description of the District's purposes in that case would apply with equal force to any other public benefit corporation, for the "true beneficiary" of any New York public benefit corporation is the State of New York and its people (Matter of New York Post Corp. v Moses, 10 NY2d 199, 204 [1961]).

BPCA's reliance on Patterson (41 NY2d 714) is misplaced. In that case, we considered an action by the members of the Board of the Jones Beach State Parkway Authority and the institutional trustee for the Authority's bondholders for a judgment declaring a State statute unconstitutional. However, as relevant here, we said only that "[w]e do agree with the Special Term . . . that the governmental plaintiffs, as well as the institutional representative of the bondholders, have sufficient standing to maintain this action" (id. at 719 n *). The Special Term's ruling, in turn, suggests that the issue in Patterson (unlike in Black River) was standing as traditionally defined, rather than capacity (see Patterson v Carey, 83 Misc 2d 372, 376 [Sup Ct, Albany County 1975] ["The individual plaintiffs as members of the Authority have the requisite standing to obtain a declaratory judgment . . . There can be no doubt that plaintiffs have a 'personal stake in the outcome' of this litigation"] [citing Board of Educ. v Allen, 20 NY2d 109 [1967], affd 392 US 236 [1968]; Baker v Carr, 369 US 186 (1962)], affd 52 AD2d 171 [3d Dept 1976], affd as modified 41 NY2d 714).[7]

D.

We therefore hold that, under the capacity rule, public

---

[7] The Special Term appeared to be relying on the United States Supreme Court's suggestion in Allen, on writ of certiorari from this Court, that local public officials who took an oath to support the United States Constitution had a "personal stake in the outcome" of the litigation (Allen, 392 US at 241 n 5), thus satisfying the standing requirements articulated in Baker (see Baker, 369 US at 204).

benefit corporations have no greater stature to challenge the
constitutionality of State statutes than do municipal
corporations or other local governmental entities. Of course, our
holding today does not mean that public benefit corporations can
never raise such constitutional challenges; like municipalities,
they may avail themselves of an exception to the general rule
(see City of New York, 86 NY2d at 291-92). However, courts need
not engage in a "particularized inquiry" to determine whether a
public benefit corporation should first be treated like the
State. Unlike in other contexts, for purposes of our capacity
bar, every public benefit corporation is the State.

III.

The second question, as originally certified, asks
which of two purportedly inconsistent standards of review -- the
"reasonable[ness]" standard adopted in Robinson v Robins Dry Dock
& Repair Co. (238 NY 271 [1924]) or the "serious injustice"
standard adopted in Gallewski v H Hentz & Co. (301 NY 164)--
governs the constitutionality of a claim-revival statute under
the Due Process Clause of the New York Constitution.

We do not read these cases to be in substantial
disagreement; however, this case presents an opportunity for this
Court to reconcile them and articulate a uniform standard of
review. Therefore, in accordance with the certification of the
Second Circuit (see In re World Trade Center Lower Manhattan
Disaster Site Litig., 846 F3d at 70 ["we do not bind the Court of

Appeals to the particular questions stated"]), we reformulate the second certified question as follows: "Under Robinson and Gallewski, what standard of review governs the merits of a New York State Due Process Clause challenge to a claim-revival statute?"

A.

At the outset, we note that the development of our law on claim-revival statutes has differed from the development of the federal rule.

Claim revival statutes generally pose no issue under the Fourteenth Amendment to the United States Constitution (see Plaut v Spendthrift Farm, Inc., 514 US 211, 229 [1995] [statutes of limitations "can be extended, without violating the Due Process Clause, after the cause of action arose and even after the statute itself has expired"]). The United States Supreme Court articulated the rule in Chase Securities Corp. v Donaldson:

> "[W]here lapse of time has not invested a party with title to real or personal property, a state legislature, consistently with the Fourteenth Amendment, may repeal or extend a statute of limitations, even after right of action is barred thereby, restore to the plaintiff his remedy, and divest the defendant of the statutory bar"

(325 US 304, 311-312 [1945]).

Unlike the federal rule, our State standard has not turned on this formal distinction between claim-revival statutes that intrude upon a "vested" property interest and those that do not. Rather, as we illustrate below, our cases have taken a more

functionalist approach, weighing the defendant's interests in the availability of a statute of limitations defense with the need to correct an injustice. Each time we have spoken on this topic, we described circumstances that would be sufficient for a claim-revival statute to satisfy the State Due Process Clause, with specific reference to the facts then before us. Each of these cases merits our close attention.[8]

                                    B.

        The first case in which we directly addressed the constitutionality of a claim-revival statute was Robinson (238 NY 271), where a plaintiff brought a wrongful death action against defendants for the death of her husband. At the time, there was a two-year statute of limitations for such actions; the action was brought in December 1920, more than two years after the victim's death. During the two years following her husband's death, the plaintiff applied for, and received, a workers' compensation award, which by law was her exclusive remedy against the defendants. However, these benefits were cut off approximately two years after her husband's death when the United States Supreme Court struck down the applicable New York workers' compensation provision as unconstitutional (see Knickerbocker Ice Co. v Stewart, 253 US 149 [1920]). In response, the legislature amended the law in 1923 to allow such plaintiffs to commence an

_____

        [8] Although the parties disagree as to what the standard of review is, all parties agree that it should reflect our existing case law in some sense. Neither the plaintiffs nor the Attorney General have asked us to adopt the federal standard in this case.

action, even if otherwise time-barred, within one year after the statute took effect.

The Court expressly declined to either adopt or reject the federal rule that the legislature had "general power to revive a cause of action for personal debts or a cause of action for tort," and decided that the case could be resolved on narrower grounds (Robinson, 238 NY at 276-77; cf. Campbell v Holt, 115 US 620 [1885]). While the Court acknowledged the possibility that, in some cases, a claim-revival statute would be unconstitutional, it declared that "both instinct and reason revolt at the proposition that redress for a wrong must be denied" where the enforcement of a statute of limitations would be "contrary to all prevailing ideas of justice" (id. at 279). In support of this proposition, the Court quoted at length from two decisions by then-Chief Justice Holmes of the Supreme Judicial Court of Massachusetts, both of which were highly skeptical of striking down claim revival statutes on constitutional grounds, but which did not outright embrace the proposition that such statutes were always constitutional (see id. at 277-79, citing Danforth v Groton Water Co., 59 NE 1033 [Mass 1901]; Dunbar v Boston & P.R. Corp., 63 NE 916 [Mass 1902]). In particular, the Court cited with approval Justice Holmes' observation that:

> "the prevailing judgment of the profession
> has revolted at the attempt to place
> immunities which exist only by reason of some
> slight technical defect on absolutely the
> same footing as those which stand on
> fundamental grounds. . . . [M]ultitudes of

> cases have recognized the power of the
> Legislature to call a liability into being
> where there was none before, if the
> circumstances were such as to appeal with
> some strength to the prevailing views of
> justice, and if the obstacle in the way of
> the creation seemed small"

(id. at 278, quoting Danforth, 59 NE at 1033-1034). Ultimately, the Court upheld the claim revival statute at bar on the grounds that there was "no arbitrary deprivation by the Legislature" and that the statute "was reasonable" in response to a situation that "call[ed] for remedy" (id. at 279-280).

The next case to revisit the Robinson doctrine was Gallewski (301 NY 164), an action by the administrator of the estate of Fritz B. Gutmann, a citizen and resident of the Netherlands. On May 10, 1940, the Netherlands was invaded by Nazi Germany. German authorities arrested Gutmann and deported him to a concentration camp; it was later learned that he was murdered there. Between May 14 and May 22, 1940, only days after the invasion, his New York brokerage firm executed a series of unauthorized securities transactions on his account. It was not until the liberation of the Netherlands in 1945 that a curator was appointed under Dutch law to administer Gutmann's assets. After the unauthorized transactions were discovered in 1946, the administrator of Gutmann's estate filed suit in 1948, but because the suit commenced more than six years after the cause of action accrued, it was barred by the statute of limitations. However, after the commencement of the action, the legislature amended the

law to toll the statute of limitations for citizens of Axis-occupied countries during the period of such occupation (see L 1949, ch 326). The statute operated retroactively so as to revive claims, such as the plaintiff's, that had already been time-barred at the time of enactment (see Gallewski, 301 NY 170-171).

Addressing the constitutionality of the statute, the Court held that it would "treat the case within the limits of our decision in the Robinson case," which "must be read, at the very least, as holding that a revival statute is not necessarily and per se void as a taking of 'property' without due process of law" (id. at 173, 174). The Court explained that Robinson "may be read, we think, as holding that the Legislature may constitutionally revive a personal cause of action where the circumstances are exceptional and are such as to satisfy the court that serious injustice would result to plaintiffs not guilty of any fault if the intention of the Legislature were not effectuated" (id. at 174). Unlike the "inclusive and categorical rule" adopted by federal courts, Robinson "leave[s] the court free to approach each revival statute on its individual merits, [in] the light of its own peculiar circumstances and setting" (id.). Applying the rule to the facts, the Court upheld the statute on the grounds that, "as in the Robinson case, the 'extension of the time to bring . . . action was reasonable'" (id. at 175, quoting Robinson, 238 NY at 280). As with Robinson,

the Gallewski Court expressly declined to either adopt or reject the federal standard (see id. at 173).

We next addressed the topic in 1954, when we affirmed, without opinion, a decision of the Appellate Division upholding amendments to the workers' compensation law reviving claims for caisson disease (see Matter of McCann v Walsh, 282 AD 444 [3d Dept 1953], affd without opinion 306 NY 904 [1954]). The claimant in that case was exposed to compressed air as he worked on the construction of the Queens Midtown Tunnel, his last exposure being in 1938. He did not develop caisson disease symptoms until 1950. The law in effect in 1938 provided that an employee who contracted an occupational disease and then left his employer was not entitled to compensation unless the disease was contracted "within the twelve months previous to the date of disablement" (L 1931, ch 344). In 1946, the legislature "recognized that it was unjust to apply this general rule to a disease like caisson disease which was of a slow-starting or insidious nature," and therefore amended the law to exclude "compressed air illness" from this time limitation (L 1946, ch 642). In 1947, the legislature also amended the then-governing statute of limitations so that claims for slow-starting diseases could be commenced "within ninety days after disablement and after knowledge that the disease is or was due to the nature of the employment" (L 1947, ch 77; L 1947, ch 624). These statutes retroactively revived the claimant's previously time-barred

claims. The claimant sued within days of the onset of his first

symptoms in 1950.

The Appellate Division recited Gallewski's holding that

the legislature may revive a cause of action in response to a

"serious injustice" (McCann, 282 AD at 449, quoting Gallewski,

301 NY at 174). The Gallewski standard, according to the court,

"follow[ed]" Robinson (id.). Applying this standard, the

Appellate Division easily found the law constitutional:

> "This is a classic instance of the granting
> of legislative relief in a situation where
> the arbitrary application of the statute of
> limitations would work injustice. As the
> legislature recognized, in the case of a
> disease of an insidious character, the
> effects of which might be latent or long
> delayed, the right to compensation might be
> barred by the operation of the Statute of
> Limitations even before the claimant was
> aware of the fact that he had the disease. In
> these circumstances, the legislature did no
> more than to comply with the simple demands
> of justice in relieving innocent claimants of
> the effect of the statutory time limitations
> which would otherwise bar their right to
> compensation"

(id. at 450).

The last of our cases addressing the

constitutionality of claim-revival statutes was Hymowitz v

Eli Lilly & Co. (73 NY2d 487 [1989]). Numerous plaintiffs

brought suit against defendant drug manufacturers, alleging

that they were injured by taking the drug diethylstilbestrol

(DES) while pregnant. As the Court recognized, "due to the

latent nature of DES injuries, many claims were barred by

the Statute of Limitations before the injury was discovered" (id. at 503). The applicable statute of limitations period accrued on the plaintiffs' exposure to the drug; it was not until 1986 that the legislature addressed this problem and statutorily instituted a discovery rule for "the latent effects of exposure to any substance" (L 1986, ch 692 § 2). The same statute also revived for one year causes of action for exposure to DES that had previously been time-barred (id. § 4).

The Hymowitz Court suggested a possible inconsistency between the Robinson and Gallewski tests (see Hymowitz, 73 NY2d at 514). The Court held, however, that it "need not light upon a precise test here," since the statute at issue would pass muster even under the purportedly stricter Gallewski standard:

> "The latent nature of DES injuries is well known, and it is clear that in the past the exposure rule prevented the bringing of timely actions for recovery. Thus we believe that exceptional circumstances are presented, that an injustice has been rectified, and that the requirements of Gallewski v Hentz & Co. (supra) have been met"

(id.).

C.

The Second Circuit, in certifying this question, apparently read Robinson to hold that a statute will satisfy the State constitution so long as it is "a 'reasonable' exercise of the Legislature's power" (In re World Trade Center Lower Manhattan Disaster Site Litig., 846 F3d at 68, quoting Robinson,

238 NY at 280). Our holding in Robinson was slightly more demanding than pure "reasonable[ness]": Robinson held that the Due Process Clause of the State Constitution is "satisfied if there was an apparent injustice which 'calls for [a] remedy,' and which is 'reasonable' and not 'arbitrary'" (Hymowitz, 73 NY2d at 514, quoting Robinson, 238 NY at 279-80).

A close reading of Gallewski reveals that it did not overrule or narrow Robinson. To the contrary, it expressly reaffirmed the Robinson standard (see 301 NY at 175 ["Here, as in the Robinson case, the 'extension of the time to bring . . . action was reasonable'"]). By elaborating that "[Robinson] may be read . . . as holding that the Legislature may constitutionally revive a personal cause of where the circumstances are exceptional and . . . serious injustice would result to plaintiffs not guilty of any fault" (id. at 174), the Court was describing the particular circumstances of the case before it, providing additional color on Robinson and concluding that the extraordinary events of World War II more than satisfied the test. Any purported dichotomy between Robinson's and Gallewski's holdings is illusory.

The salient facts in each of Robinson, Gallewski, McCann and Hymowitz fall into the same pattern. First, there existed an identifiable injustice that moved the legislature to act. In Robinson, it was the plaintiffs' exclusive reliance on a provision of the workers' compensation law that was struck down

by the United States Supreme Court (see 238 NY at 279); in

Gallewski, it was the occupation of the plaintiffs' countries of

residence during World War II (see 301 NY at 175); in Hymowitz

and McCann, it was latent injuries caused by harmful exposure,

which the plaintiffs were not able to attribute to an action or

omission of the defendant until the statutory period to bring a

claim had already expired (see Hymowitz, 73 NY2d at 514-15;

McCann, 282 AD at 445-46). Second, in each case, the

legislature's revival of the plaintiff's claims for a limited

period of time was reasonable in light of that injustice.

A more heightened standard would be too strict. In the

context of a claim-revival statute, there is no principled way

for a court to test whether a particular injustice is "serious"

or whether a particular class of plaintiffs is blameless; such

moral determinations are left to the elected branches of

government. While we have traditionally expressed an "aversion to

retroactive legislation" (Hodes v Axelrod, 70 NY2d 364, 370-71

[1987]), of which claim-revival statutes are one species (see

Decker v Pouvailsmith, 252 NY 1, 5-6 [1929]), "we have noted that

the modern cases reflect a less rigid view of the Legislature's

right to pass such legislation" (Hodes, 70 NY2d at 371; see also

Usery v Turner Elkhorn Mining Co., 428 US 1, 15 [1976]

["legislative Acts adjusting the burdens and benefit of economic

life come to the Court with a presumption of

constitutionality"]). Nonetheless, there must first be a judicial

determination that the revival statute was a reasonable measure to address an injustice.

## D.

We now arrive at our answer to the second certified question, as reformulated herein. The cases we have just discussed all express one and the same rule: a claim-revival statute will satisfy the Due Process Clause of the State Constitution if it was enacted as a reasonable response in order to remedy an injustice.

## IV.

Accordingly, the first certified question should be answered in the negative and the second certified question, as reformulated, should be answered in accordance with this opinion.

In re : World Trade Center Lower Manhattan Disaster Site
Litigation

No. 119

RIVERA, J.(concurring) :

We have accepted the following two certified questions

from the Second Circuit.

> "(1) Before New York State's capacity-to-sue
> doctrine may be applied to determine whether
> a State-created public benefit corporation
> has the capacity to challenge a State
> statute, must it first be determined whether
> the public benefit corporation 'should be
> treated like the State,' [(Clark-Fitzpatrick,
> Inc. v Long Island R.R. Co., 70 NY2d 382
> [1987])], based on a 'particularized inquiry
> into the nature of the instrumentality and
> the statute claimed to be applicable to it,'
> [(John Grace & Co. v State Univ. Constr.
> Fund, 44 NY2d 84 [1978])], and if so, what
> considerations are relevant to that inquiry?;
> and
>
> "(2) Does the 'serious injustice' standard
> articulated in [Gallewski v H. Hentz & Co.
> (301 NY 164 [1950])], or the less stringent
> 'reasonableness' standard articulated in
> [Robinson v Robins Dry Dock & Repair Co. (238
> NY 271 [1924])], govern the merits of a due
> process challenge under the New York State
> Constitution to a claim-revival statute?"

(In re World Trade Center Lower Manhattan Disaster Site Litig.,

846 F3d 58, 70 [2d Cir 2017])

I write separately to expand on the majority's answer

to the first certified question, and to explain why, in our

answer to the second question, we should expressly adopt the

- 1 -

federal rule, according to which claim-revival statutes do not raise due process concerns unless "lapse of time has []vested a party with title to real or personal property" (<u>Chase Securities v Donaldson</u>, 325 US 304, 311 [1945]).

A. <u>First Certified Question: Exceptions to the General No-Capacity Rule</u>

With respect to the first certified question, I agree with the majority's comprehensive and well-reasoned analysis explaining that a public benefit corporation, like a municipal or local government entity, lacks capacity to sue unless the circumstances of the case support an exception to that rule.  We have recognized exceptions to the capacity to sue bar where there is "(1) an express statutory authorization to bring such a suit; (2) where the State legislation adversely affects a municipality's proprietary interest in a specific fund of moneys; (3) where the State statute impinges upon "Home Rule" powers of a municipality constitutionally guaranteed under article IX of the State Constitution; [or] (4) where the municipal challengers assert that if they are obliged to comply with the State statute they will by that very compliance be forced to violate a constitutional proscription" (<u>City of New York v State of New York</u>, 86 NY2d 289, 291-292 [1995] [internal quotation marks and citations omitted]).

We have never stated that this list is exhaustive. While no "particularized inquiry" is necessary to determine whether a public benefit corporation should be treated like the state (because "for purposes of our capacity bar, every public benefit corporation is the State" [majority op at 21]), when a public benefit corporation seeks to sue the State, a court must determine whether its suit fits into one of the previously identified exceptions or some other exception deemed appropriate under the particular facts of the case. To reach that determination, a court must consider the common thread in the existing exceptions, which recognize the constitutional protections afforded state-created entities, as well as their legislative grant of authority. These exceptions are intended to ensure that state-created entities are not thwarted in achieving their constitutionally- and statutorily-mandated purposes within our democratic system of government.

The legislature may, of course, redefine, unchallenged, the powers and authority of a public benefit corporation (Black River Regulating Dist. v Adirondack League Club, 307 NY 475, 487 [1954]), even dissolve the corporation. What it cannot do is prevent the corporation from exercising its authority to fulfill its statutorily-mandated purpose in compliance with the constitution and its enabling statutes.

To determine what a public benefit corporation may do, courts must scrutinize the public benefit corporation's laws,

purpose, and the constitutional and statutory scheme into which it fits.  As "[g]overnmental entities . . . [are] artificial creatures of statute [. . . , they] have neither an inherent nor a common-law right to sue" (Community Bd. 7 of Borough of Manhattan v Schaffer, 84 NY2d 148, 155-56 [1994]).  Any capacity to challenge a State statute, then, "must be derived from the relevant enabling legislation or some other concrete statutory predicate" or, as relevant, our constitutional framework (id. at 156).  Courts should therefore attend to the nature and purpose of the public benefit corporation seeking to bring suit, examining "the legislative [and constitutional] scheme" that encompasses it, with special attention to the public benefit corporation's "power[s] and responsibilit[ies]" (Matter of City of New York v City Civ. Serv. Commn., 60 NY2d 436, 441 [1983]).  Courts should look to the public benefit corporation's (i) organic legislation, (ii) other legislation, if any, that the corporation is charged with implementing, (iii) the public benefit corporation's "functional responsibilit[ies]" (Community Bd. 7, 84 NY2d at 156 [quoting Matter of City of New York v City Civ. Serv. Commn., 60 NY2d at 445]), (iv) indicia of legislative intent, and (v), as relevant or implicated, the State constitution.


    B.  Second Certified Question: Claim-Revival Statutes Do Not
        Deprive a Party of a Non-Vested Due Process Right

The second certified question asks what standard governs the constitutionality of claim-revival statutes under our State Due Process Clause. The majority reformulates this question to focus narrowly on our prior decisions in <u>Robinson v Robins Dry Dock & Repair</u> (238 NY 271 [1924]) and <u>Galleskwi v Hentz & Co</u> (301 NY 164 [1950]) (<u>see</u> majority op at 21-22). I have no disagreement with the majority's analysis of these cases. However, I would go beyond harmonizing our holdings in prior claim-revival cases and take the opportunity this question presents to state expressly that a claim-revival statute is constitutional unless it deprives a party of a vested property interest.[*]

---

[*] As a general rule, the Court considers only those arguments raised by the parties or which arise by necessity in our analysis of the questions explicitly presented. These limitations are grounded in prudential concerns closely connected with the consideration of concrete cases and controversies. However, here we are not deciding the appeal of a case, subject to our usual jurisdictional and reviewability limitations. Instead, we are presented with a certified question from the Second Circuit, which it has invited us to reformulate as we deem appropriate. Thus, this case does not raise the usual prudential concerns that arise when we pronounce on issues not properly developed below or by the parties.

Moreover, the argument I advance here is hardly novel or in need of greater prior elaboration. As the majority's comprehensive discussion of our case law makes abundantly clear, the constitutionality of claim-revival statutes has been before us on several earlier occasions, and each time this Court has discussed the Supreme Court's Fourteenth Amendment analysis. I do no more here. We are in no way disadvantaged by deciding the applicability of the federal rule now, when it is obvious the Court is already well familiar with the issues, our constitutional standards, and the federal analysis.

The United States Supreme Court has determined that "where lapse of time has not invested a party with title to real or personal property, a state legislature, consistently with the Fourteenth Amendment, may repeal or extend a statute of limitations, even after right of action is barred thereby, restore to the plaintiff [the] remedy, and divest the defendant of the statutory bar" (Chase Securities Corp v Donaldson, 325 US 304, 311-312 [1945]).  This "long[standing] statement of the law of the Fourteenth Amendment" reflects the truism that statutes of limitations are not born of technical legal principles that underlie judicial decisionmaking, but instead are creatures of the legislature and represent policy judgments solely within the purview of elected officials (id. at 312).  As the Supreme Court has explained:

> "Statutes of limitation find their justification in necessity and convenience rather than in logic.  They represent expedients, rather than principles.  They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost.  They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay.  They have come into the law not through the judicial process but through legislation.  They represent a public policy about the privilege to litigate.  Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right of the individual.  [A party] may, of course, have the protection of the policy while it exists, but the history

> of pleas of limitation shows them to be good
> only by legislative grace and to be subject
> to a relatively large degree of legislative
> control"

(id. at 314 [internal citation omitted]).  Thus, the Court has
explained that "the Fourteenth Amendment does not make an act of
state legislation void merely because it has some retrospective
operation.  What it does forbid is the taking of life, liberty or
property without due process of law . . . [and], certainly it
cannot be said that lifting the bar of a statute of limitation so
as to restore a remedy lost through mere lapse of time is per se
an offense against the Fourteenth Amendment" (id. at 315-316
[emphasis added]).

Even under our more expansive State Due Process Clause
(see e.g. People v LaValle, 3 NY3d 88, 127 [2004] [gathering
cases]), we are still concerned with an actual deprivation of
life, liberty or property (see NY Const, art I, § 6 ["No person
shall be deprived of life, liberty or property without due
process of law."]).  No such deprivation is at issue where a
defendant seeks merely to cut short the time during which a
plaintiff may sue.  A defendant has no separate vested right in
the timing of a lawsuit or the final date upon which a plaintiff
may seek relief.  Defendant may find it objectionable that the
state legislature saw fit to provide plaintiffs more time to
pursue their remedy, but because the legislature did not violate
any fundamental right of the defendant in doing so, defendant has
no grounds to legally challenge the claim-revival statute.

Adopting the federal standard, which recognizes the legislature's authority to revive claims where defendant is not deprived of a vested interest, is logically, historically, and jurisprudentially sound. Besides, it would seem to operate functionally the same as the rule announced by the majority today -- that a claim-revival statute does not violate due process so long as it constitutes "a reasonable response in order to remedy an injustice" (majority op at 32). That rule would appear to be no barrier to enactment of claim-revival laws. The standard is easily met. It is not difficult to establish that a statute is "a reasonableness response." Indeed, every time this Court has considered the issue in the past it has upheld the legislature's claim-revival statute as a proper response to the problem the legislature sought to address (see Robinson, 238 NY at 280; Gallewksi 301 NY at 174-175; Matter of McCann v Walsh Constr. Co., 282 AD 444, 450 [3rd Dept 1953] affmd on op below 306 NY 904 [1954]; Hymowitz v Eli Lilly & Co, 73 NY2d 487, 514 [1989]; see also In re World Trade Center Lower Manhattan Disaster Site Litig., 846 F3d at 69 [noting that "neither party has cited to us, nor have we found, any case in which any New York state court has struck down any statute reviving expired claims"]).

Certainly the judiciary is not the proper body to make the hard policy decisions behind these statutes. Instead, and appropriate to its position in our democratic system of government, the judiciary will defer to the legislative

determination of what constitutes an injustice precisely because "there is no principled way for a court to test whether a particular injustice is 'serious' or whether a particular class of plaintiffs is blameless; [and] such moral determinations are left to the elected branches of government" (majority op at 31).

Just as has been true every other time the Court has considered the constitutionality of a claim-revival statute, the rule announced by the majority will result in a finding that the statute does not deprive the defendant of due process.  Rather than have a court attempt to balance policy considerations that are in fact consigned to the legislature, I would resolve the question directly and recognize the obvious: unless it impinges on a separate vested property right and not merely the hope of avoiding litigation, a claim-revival statute does not violate due process, because defendant has no fundamental right to a statute of limitations in perpetuity.

In re: World Trade Center Lower Manhattan Disaster Site
Litigation

No. 119

WILSON, J.(concurring):

I subscribe fully to the court's answer to the second
certified question. I write separately because I do not view the
first certified question as involving an issue of "capacity,"
even though a few of our decisions describe it that way. Nor do
I view it as a question of when a public benefit corporation
should be treated as if it were the state. The question, as I
see it, is whether and under what circumstances a public benefit
corporation can challenge a legislative act as unconstitutional.
That is a not a question of capacity, which has a firm and
longstanding legal meaning relating to the binary ability to sue
and be sued (or not), but of the power of a legislatively-created
entity to challenge an action of its creator. The answer to that
question is derived from the structure of government and the
roles of the coordinate branches. We have most often articulated
that doctrine not as one of capacity, but of "standing" or
"power," which comes closer to describing the forces at work
here.

The general presumption that legislatively created
entities cannot challenge acts of the legislature derives from
"the supreme power of the Legislature over its creatures" (<u>Black</u>

- 1 -

River Regulating Dist. v Adirondack League Club, 307 NY 475, 488
[1954] ["political power conferred by the Legislature confers no
vested right as against the government itself"]).  That
presumption is rooted in the structure of government;
legislatively-created entities, such as public benefit
corporations, are subservient political entities.  An entity's
power is given by the legislature, and "how long it shall exist
or how it may be modified or altered belongs exclusively to the
people to determine" (id. at 488).  Accordingly, it is the rare
case when the entity may challenge an act of the legislature.
Admittedly, our decisions have not always been clear in
terminology; from time to time, we have muddied the waters.  The
appropriate response today, as requested by the United States
Court of Appeals for the Second Circuit, is to clear away the
mud.

                                I.

              "There is a difference between capacity to
              sue, which is the right to come into court,
              and a cause of action, which is the right to
              relief in court.  Incapacity to sue exists
              when there is some legal disability, such as
              infancy or lunacy or a want of title in the
              plaintiff to the character in which he sues.
              The plaintiff was duly appointed receiver and
              has a legal capacity to sue as such, and,
              hence, could bring the defendants into court
              by the service of a summons upon them even if
              he had no cause of action against them. On
              the other hand, an infant has no capacity to
              sue, and, hence, could not lawfully cause the
              defendants to be brought into court even if
              he had a good cause of action against them.
              Incapacity to sue is not the same as
              insufficiency of facts to sue upon"

(Ward v Petrie, 157 NY 301 [1898]).  Capacity is defined as "the satisfaction of a legal qualification, such as legal age or soundness of mind, that determines one's ability to sue or be sued" (Black's Law Dictionary [10th ed 2014], capacity). Capacity concerns "the litigant's power to appear and bring its grievance before the court" (Community Bd. 7 of Borough of Manhattan v Schaffer, 84 NY2d 148, 155 [1994]).  "Capacity may depend on a litigant's status or . . . on authority to sue or be sued" (Silver v Pataki, 96 NY2d 532, 537 [2001]).  The capacity of governmental entities to sue can be either express or implied (see 84 NY2d at 156 ["Being artificial creatures of statute, [governmental] entities have neither an inherent nor a common-law right to sue. Rather, their right to sue, if it exists at all, must be derived from the relevant enabling legislation or some other concrete statutory predicate"]).  Thus, where the power to sue is expressly granted, an entity has capacity to sue or be sued; no further inquiry is required.

Here, there is no question that the BPCA has the capacity to sue and be sued.  Its enabling legislation specifically grants it that power, unlike the community board in Community Bd. 7, which lacked any express statutory authority to sue or be sued (compare Public Authorities Law § 1974 [expressly providing that the BPCA "shall have power" "to sue and be sued"] with Community Bd. 7 at 157 ["neither New York City Charter § 2800 nor the relevant ULURP provisions expressly authorize

community boards to bring suit"]).  Indeed, if the BPCA lacked legal capacity, this lawsuit would not exist, and Jimmy Nolan's Law -- which extended the statute of limitations for actions against a public corporation -- would have been futile.

Whether a natural person or artificial entity may sue or be sued is a question of capacity.  Whether a governmental entity may sue to challenge a governmental action could properly be thought of as one of general justiciability, but equally could be expressed as one of standing, which is the way most of our decisions have framed it.  Standing has two components: a jurisdictional component, so that if a party suffers no injury, it may not sue; and a prudential component, involving "rules of self-restraint," which includes the determination that a party is well-situated to bring an action on its own or on behalf of another (see Society of Plastics Indus., Inc. v Cty. of Suffolk, 77 NY2d 761, 773 [1991] [explaining the "prudential limitations" of standing include "a general prohibition on one litigant raising the legal rights of another; a ban on adjudication of generalized grievances more appropriately addressed by the representative branches; and the requirement that the interest or injury asserted fall within the zone of interests protected by the statute invoked"]).  We have cautioned that "the concept of capacity is often confused with the concept of standing, but the two legal doctrines are not interchangeable," and that "[t]he concept of a lack of capacity . . . has also occasionally been

intermingled with the analytically distinct concept of a failure to state a cause of action" (Community Bd. 7, 84 NY2d at 154-155), yet we sometimes have failed to heed our own warnings.

In the context of challenges brought by legislatively-created entities to actions of the legislature, we have usually described the issue as one of "power," "standing," or "status," rather than "capacity." The occasional imprecise introduction of the word "capacity" is traceable to a quirk of jurisdiction evident in Albany County v Hooker (204 NY 1 [1912]), which was adopted many years later in City of New York v State of New York (86 NY2d 286, 289 [1995]). In Hooker, the Appellate Division certified a question for appeal, casting it as: "Has the county of Albany legal capacity to bring this action?" Explaining that our court's "jurisdiction is restricted to a review of that question," we painstakingly noted that the "Revised Statutes of 1829 . . . provided: 'Each county, as a body corporate, has capacity . . . To sue and be sued in the manner prescribed by law;" and the Constitution of 1846 "provided that 'All corporations shall have the right to sue, and shall be subject to be sued in all courts, in like cases, as natural persons. And such provision was continued in the Constitution of 1894"; and finally, that by statute, "A county is a municipal corporation" (204 NY at 9-11). After emphasizing the capacity of counties to sue and be sued, Hooker held that "the action cannot be maintained by the plaintiff, and the wrong, if any,

created and existing by the acts of the legislature, must be corrected by the legislature" (id. at 18). Hooker rested on the proposition that counties, like "the several towns[,] are political divisions, organized for the convenient exercise of the political power of the state; and are no more corporations than the judicial, or the senate and assembly districts" (id., quoting Lorillard v Town of Monroe, 11 NY 392 [1854]).[1]

Most of the decisions cited by the majority do not express the underlying issue as one of capacity. In Matter of County of Cayuga v McHugh (4 NY2d 609 [1958]), Cayuga County sued the State Commissioner of Prisons. We did not mention capacity; instead, we reached the merits and held that the Commissioner's action was not arbitrary (id. at 613). In Town of Black Brook v State (41 NY2d 486, 489 [1977]), there is likewise no mention of the town's capacity to sue; we determined that the town had "standing" to pursue its claim against the state. In Village of

_____

[1] Although it might be tempting to read Hooker as suggesting that counties have capacity to sue in their proprietary role but not in their governmental role, that reading is unsatisfactory, because counties can be sued in their governmental role, and can sue private citizens while acting in their governmental role. Hooker must be understood in its jurisdictional posture, where this court, constrained to answer the question posed by the Appellate Division without the ability to reformulate it to remove the word "capacity," "assumed that by the question submitted it is intended that this court shall determine whether the county has capacity to maintain the *particular action* stated in the complaint" (204 NY at 9 [emphasis added]). That emendation, though restating the word "capacity," emphasizes that the court's rule is claim-specific, meaning it is not one of capacity, but of standing, justiciability or existence of a cause of action.

Herkimer v Axelrod (58 NY2d 1069, 1071 [1984]), we held that a
municipal hospital lacked "standing" to sue the state Department
of Health; again, there is no mention of the hospital's lack of
capacity.

As the majority notes, the case most closely analogous
to the present matter, Black River, speaks only in terms of
"status," "standing" or "power," not capacity.[2]  The majority
concludes that Black River, despite discussing standing and not
capacity, was really about capacity and involved "no real issue
of 'standing,'" because the District's condemnation proceeding
against a private landowner would have been unlawful unless the
District obtained a declaration that the Stokes Act was
unconstitutional.  To the contrary, the District clearly had the
power to sue and be sued -- else it could not have brought a
condemnation proceeding irrespective of the Stokes Act's
constitutionality.  Moreover, our detailed rationale does not
mention the inability of the District to sue or be sued, but
rather the district's lack of standing to challenge an act of the
legislature, which is supreme over it: "Inherent in the grant of
legislative power is the plenary power to alter or revoke. . . .
The interests of the plaintiffs then are only those of the State

_____

[2] In Black River, the Black River Regulating District
challenged the Stokes Act as unconstitutional.  We held that "the
plaintiffs are without power to challenge the validity of the act
or the Constitution . . . The issuance of certificates of
indebtedness does not confer upon plaintiffs an independent
status by which they have standing, either as a body politic or
as individuals, to test the validity of the Stokes Act" (307 NY
at 489 [emphasis added]).

and the State cannot challenge its own acts" (307 NY at 477).
The District had no injury-in-fact from the Stokes Act, because
the District itself could be eliminated or altered by legislative
command.

The Appellate Division cases cited by the majority are
largely in accord with our prior decisions, treating the issue as
one of standing.  Town of Moreau v Saratoga County (142 AD2d 864
[3rd Dept 1988]), County of Rensselear v Regan (173 AD2d 37 [3d
Dept 1991], affd 80 NY2d 933 [1992]), City of Buffalo v State Bd.
of Equalization and Assessment (26 AD2d 213 [3d Dept 1966]), and
Gulotta v State (228 AD2d 555 [2d Dept 1996]) discuss the issue
in terms of standing only, not capacity.  The two Appellate
Division cases cited by the majority that do characterize the
issue as one of capacity, New York Blue Line Council, Inc. v
Adirondack Park Agency (86 AD3d 756 [3d Dept 2011]) and County of
Nassau v State (100 AD3d 1052 [3d Dept 2012]), were decided after
City of New York, and repeat the wayward "capacity" language
therein.

What the relevant cases have in common -- and as to
this, I believe the majority and I agree -- is that the
restriction on governmental entities challenging legislative
action derives from the intrinsic structure of our government and
separation of powers concerns.  The legislative branch has the
power to create entities (including public benefit corporations)
to carry out its functions; the legislature also has the power to

change, affect, and even eliminate those entities entirely.
Because it is within the legislature's plenary power to do so,
the courts generally have no role in determining the wisdom of
legislative enactments regarding those entities.  Judicial
restrictions based on the separation of powers usually implicate
justiciability, not capacity (see New York State Inspection, Sec.
& Law Enf't Employees, Dist. Council 82, AFSCME, AFL-CIO v Cuomo,
64 NY2d 233, 239 [1984]; Korn v Gulotta, 72 NY2d 363, 381 [1988];
see also Jiggetts v Grinker, 75 NY2d 411, 415 [1990] ["policy
choices . . . are matters for the executive and legislative
branches of government and the place to question their wisdom
lies not in the courts but elsewhere"]).  Indeed, the issue here
is as much one of justiciability as of standing: in the ordinary
case, the judiciary would not interfere in a legislative decision
to eliminate, modify or impair an entity of its own creation.  It
is not our function to second-guess the wisdom of legislation
that adversely affects only a legislatively-created entity. The
majority explains that the rationale for the so-called "capacity
bar" reflects concerns of "judicial restraint" and "governmental
and public policy," and that the "capacity bar closes the
courthouse doors to internal political disputes between the State
and its subdivisions."  Those principles, by their own words,
implicate standing and justiciability, not capacity.

II.

I would tackle the certified question in stages. First, as the majority notes, we need to reformulate the question asked by the United States Court of Appeals for the Second Circuit, because the issue is much more specific than when a public benefit corporation should be treated like the state. Second, under the majority's test or mine, there is a "particularized inquiry," in the sense of an examination of facts particular to the entity's ability to sue and be sued (capacity) and its injury-in-fact and prudential concerns (standing and justiciability to me; capacity to the majority), but those are not the "particularized inquiry" of John Grace & Co. v State Univ. Constr. Fund (44 NY2d 84 [1978]).  Third, the Second Circuit has invited us to indicate how this particular case should be resolved, and I would accept that invitation.

A.

The cases identified by the Second Circuit in the first certified question, John Grace & Co. and Clark-Fitzpatrick Inc. v Long Island R.R. Co. (70 NY2d 382 [1987]), are not germane to the question of whether a public benefit corporation can challenge a legislative act as unconstitutional.  I agree with the majority on this.  Clark-Fitzpatrick holds that punitive damages are not available against public benefit corporations, and John Grace & Co. holds that a statute giving contractors relief from fuel cost spikes during the energy crisis did not apply to contracts with

public authorities, but was limited to contracts with the state itself. Those cases do not relate to the power of public benefit corporations to sue or be sued, or under what circumstances they might be able to challenge an act of the state. I would reformulate the certified question to ask whether and under what circumstances a public benefit corporation can challenge a statute as unconstitutional.

### B.

Putting aside the labels of "standing," "status," "power," or "capacity" used in our decisions and the decisions of the lower courts, the case law can be distilled into the following propositions. First, the general rule is that a legislatively-created artificial entity cannot challenge an action of the legislature, because that entity is a creature of the legislature, the legislature is vested with lawmaking authority, and the legislature may abolish or alter its creatures at will (see Black River at 433 ["The number and nature of (the regulating district's) powers are within the State's absolute discretion and any alteration, impairment or destruction of those powers by the Legislature presents no question of constitutionality"]). In that sense, those subordinate legislative creations have no cognizable injury resulting from legislative action, because our system of government vests the lawmaking power in the legislature, not to be challenged by subordinate entities, whether those are municipalities, public

authorities, public benefit corporations, or otherwise.  Second,
there are circumstances in which the general rule can be
overcome.  Those fall into two basic categories: (A) when the
state constitution grants a right specific to the subordinate
governmental unit, that unit may challenge legislative action as
violative of the specific constitutional grant to it (see e.g.
Town of Black Brook v State, 41 NY2d 486, 489 [1977] ["When,
indeed, a local government's claim is based on one of the
protections of article IX (the municipal Home Rule Law), the
principle underlying the otherwise general rule prohibiting it
from questioning legislative action affecting its powers is no
longer applicable"]); and (B) when the challenged legislative
action impairs the rights of a third party, and the subordinate
governmental unit is both affected and in a good position to
bring the claim when compared to other potential litigants, that
unit may challenge the legislative action (see e.g. Patterson v
Carey, 41 NY2d 714, 724 [1977] [allowing the Jones Beach Parkway
Authority to challenge section 153-c of the Public Authorities
Law as violating the portions of the New York Constitution
setting forth the Comptroller's powers]).

        In category (A), the traditional concerns of standing
are satisfied: the injury to the subordinate entity is direct and
the right constitutionally guaranteed to it.  In category (B),
the concerns animating prudential standing come into play: there
must be some actual injury to the subordinate governmental

entity, but that alone is not sufficient; the courts must determine as a matter of prudence whether it is appropriate for the entity to bring the suit, taking into account the strong presumption that legislatively-created entities cannot challenge legislative actions (see Black River at 488 ["The concept of the supreme power of the Legislature over its creatures has been respected and followed in many decisions"]) and the "general prohibition on one litigant raising the legal rights of another" (Society of Plastics, 77 NY2d at 773). Generally, if the third parties are the better-suited litigants, then the entity would not have standing to sue. However, sometimes the entity will be the better-suited litigant, and standing doctrine allows suit in those instances. In this regard, the inquiry is necessarily case-specific, and could be characterized as "particularized." Even the consideration of the applicability of the majority's four exceptions drawn from City of New York is case-specific -- as is each of our prior decisions and of the decisions of the lower courts. Those same factors would figure into the determination if the issue was framed as one of justiciability rather than standing: a claim by a legislatively-created entity purporting to challenge a statute should not be justiciable if there is no specific constitutional guarantee to that entity and the only injury is to the entity itself, or the injury is to some third party who is better suited to bring the claim on its own behalf.

Our case that best encompasses the above structure is Patterson v Carey (41 NY2d 714 [1977]). The Jones Beach Parkway Authority raised the parkway toll from 10 cents to 25, and the state enacted legislation repealing the toll. The Jones Beach Parkway Authority and the trustee for bondholders sued the state, challenging the legislation as unconstitutional. Although the decision does not expressly delineate between plaintiffs and claims, the structure of the decision does so quite clearly. As to the claims that the legislation unconstitutionally impaired the Authority's finances and with it, the value of the bonds, we were silent as to the impairment of the Authority's finances, focusing exclusively on the bondholders' rights when finding the statute unconstitutional (see id. at 720-722). In contrast, when addressing the claim that the legislation's restriction on the State Comptroller's procedures for auditing the Authority encroached on the Comptroller's constitutional authority, we focused exclusively on the Authority's claim (see id. at 723-725). Implicitly, we determined that the Authority did not have standing to pursue the claims relating to impairment of its finances, though the bondholders did, and the Authority had sufficient standing to challenge the statute's restriction of the Comptroller's auditing powers, because the Authority was affected by the restrictions and well-suited to challenge them. The majority, too, understands Patterson as a decision about standing, not capacity.

The four exceptions set out in <u>City of New York</u> are an application of the above principles in the context of municipal corporations, which -- unlike public benefit corporations -- have constitutional protections running directly to them.  For that reason, however unlikely it is that a county, city, town or village would be able to challenge a legislative action, the possibility that a public benefit corporation would be able to do so is substantially more remote.

C.

Unlike the majority, I would accept the Second Circuit's invitation to provide "specific guidance . . . as to the appropriate result of the inquiry in this particular case" (<u>In re World Trade Ctr. Lower Manhattan Disaster Site Litig.</u>, 846 F3d 58, 70 [2d Cir 2017], certified question accepted 28 NY3d 1159 [2017]).  It is uncommon for the Second Circuit to suggest that we provide guidance as to the proper disposition of a case before it, but in this case, the Second Circuit's suggestion makes imminent sense.  The legislature made a choice, in the wake of an unprecedented terrorist attack, to extend the statute of limitations for claims brought by first responders.  The questions here purely concern New York public policy surrounding relief efforts in the wake that attack -- including what future first responders might expect from the legislature; the structure of New York State government; and the power of the New York State legislature.  Those are not in any sense federal questions, and

relate powerfully to New York's status as a sovereign state.  As implicitly recognized by the Second Circuit's invitation, New York State has an overriding interest in deciding the lawfulness of Jimmy Nolan's Law, which indisputably complies with the Due Process Clause of the Fourteenth Amendment.

I cannot speak for the majority.  Whether thought of as "capacity," "justiciability" or "standing," I believe the clear result here is that the BPCA may not challenge the constitutionality of Jimmy Nolan's Law.  No constitutional protection runs directly to the BPCA entitling it to avoid claim-revival statutes, the BPCA does not seek to vindicate the constitutional rights of others and, even if it did, there is no showing that it would be better situated to vindicate those rights than the third parties would be.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, first certified question answered in the negative and second certified question, as reformulated, answered in accordance with the opinion herein.  Opinion by Judge Feinman.  Chief Judge DiFiore and Judges Rivera, Stein, Fahey and Garcia concur, Judge Rivera in a concurring opinion.  Judge Wilson concurs in a separate concurring opinion.

Decided November 21, 2017